IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BALFOUR BEATTY COMMUNITIES, LLC<br>1 Country View Road, Suite 100<br>Malvern, PA 19355, *and*<br><br>BALFOUR BEATTY INVESTMENTS, INC.<br>1 Country View Road, Suite 100<br>Malvern, PA 19355,<br><br>     *Plaintiffs,*<br><br>v.<br><br>STARR SURPLUS LINES INSURANCE<br>COMPANY<br>99 Park Avenue, 2nd Floor<br>New York, NY 10022,<br><br>STARR INDEMNITY & LIABILITY COMPANY<br>99 Park Avenue, 2nd Floor<br>New York, NY 10022,<br><br>FIREMAN'S FUND INDEMNITY<br>CORPORATION<br>225 West Washington Street, Suite 1800<br>Chicago, IL 60606,<br><br>     *Defendants.* | CIVIL ACTION NO. _____ |

## PLAINTIFFS' COMPLAINT

## <u>TABLE OF CONTENTS</u>

PLAINTIFFS' COMPLAINT .................................................................................. 1

INTRODUCTION ................................................................................................... 1

PARTIES AND POLICIES ..................................................................................... 4

JURISDICTION AND VENUE ............................................................................... 5

BALFOUR'S BUSINESS AND INSURANCE PROGRAM ...................................... 6

THE UNDERLYING CLAIMS AND DISPUTES .................................................... 7

    Disputes Under the Pollution Liability Policies ................................................... 7

        I.      The Underlying Claims Involving the Pollution Liability Policies ........... 7

            A.      Talarico ................................................................................... 7

            B.      Dudek .................................................................................... 9

        II.     Coverage Under Starr Surplus' Pollution Liability Policies ................... 10

        III.    Starr Surplus' Attempts to Avoid Coverage ........................................... 11

        IV.    Coverage Under Allianz's Pollution Liability Policies ........................... 14

        V.     Allianz's Attempts to Avoid Coverage ................................................... 15

    Disputes Under the General Liability Policies .................................................. 16

        I.      The Underlying Claims Involving the General Liability Policies .......... 16

            A.      Porras .................................................................................. 16

            B.      Montiel ................................................................................ 17

            C.      Greer .................................................................................... 18

        II.     Coverage Under the Starr Indemnity General Liability Policies ............ 20

        III.    Starr Indemnity's Attempt to Limit Coverage ....................................... 21

CAUSES OF ACTION ........................................................................................ 22

COUNT I: DECLARATORY JUDGEMENT REGARDING COVERAGE FOR THE
TALARICO LAWSUIT AND THE DUDEK LAWSUIT AGAINST STARR SURPLUS ...... 22

COUNT II: DECLARATORY JUDGEMENT REGARDING COVERAGE FOR THE
TALARICO LAWSUIT AGAINST ALLIANZ ......................................................... 24

COUNT III: DECLARATORY JUDGEMENT REGARDING ALLOCATION OF
DEFENSE COSTS AGAINST STARR INDEMNITY ............................................... 25

COUNT IV: CLAIM AGAINST STARR SURPLUS AND ALLIANZ FOR BREACH
OF THE COMMON LAW DUTY TO ACT IN GOOD FAITH UNDER THEIR
INSURANCE CONTRACTS ................................................................................ 27

COUNT V: CLAIM AGAINST STARR SURPLUS AND ALLIANZ PURSUANT TO
42 P.S. § 8371 ................................................................................................ 28

PRAYER FOR RELIEF ...................................................................................... 29

## <u>TABLE OF CONTENTS</u>
### (CONTINUED)

JURY DEMAND ........................................................................................................................ 30

## PLAINTIFFS' COMPLAINT

Plaintiffs Balfour Beatty Communities, LLC ("**BBC**") and Balfour Beatty Investments, Inc. ("**BBI**") (collectively, "**Balfour**")[1] file this Complaint against Defendants Starr Surplus Lines Insurance Company ("**Starr Surplus**"), Starr Indemnity & Liability Company ("**Starr Indemnity**") (Starr Surplus and Starr Indemnity, together, "**Starr**"), and Fireman's Fund Indemnity Corporation ("**Allianz**") (collectively, the "**Insurers**").

## INTRODUCTION

1.      This is an action seeking a declaratory judgement and an action seeking damages for insurer bad faith related to coverage for certain underlying cases that allege various unsafe conditions in military housing projects owned, managed, and/or operated by BBC and/or its affiliates (collectively, the "**Underlying Claims**").  The plaintiffs in the Underlying Claims allege that these allegedly unsafe conditions have caused the plaintiffs (residents) to suffer bodily injury and/or property damage.

2.      Starr and Allianz wrongly denied or limited coverage for the Underlying Claims under two sets of insurance policies—pollution liability policies and commercial general liability policies.

3.      Starr and Allianz denied or limited coverage under these policies based on two principal defenses:

            a.      First, under the pollution-liability policies, Starr Surplus and Allianz raise

                    defenses that focus on maintenance "work orders" submitted to Balfour in

---

[1] The use of "Balfour" to refer to both BBC and BBI does not indicate BBI is liable for the acts or omissions of, or claims made against, BBC, nor is it intended to indicate BBC is liable for the acts or omissions of, or claims made against, BBI.

the ordinary course of running its business of managing military housing. For example, Starr Surplus and Allianz insist that various Underlying Claims predate the policy periods of the pollution liability policies because maintenance work orders that loosely related to housing conditions each constituted a "claim" as defined in the referenced policies, and thus the "claims" predate the policies and fail to trigger them. Similarly, Starr Surplus and Allianz insist that Balfour's receipt of those work orders means that Balfour had pre-policy period knowledge of a claim and/or of pollution conditions sufficient to trigger various "Knowledge/Intent Based Exclusions" in the pollution liability policies.[2] Starr Surplus' and Allianz's arguments are contrary to the plain language in the policies, the intent of the parties, their course of dealing, and industry custom and practice in both the housing and insurance industries. Balfour runs an extensive portfolio of large residential properties and receives hundreds, if not thousands, of work orders every week from residents. Noticing each work order as a claim under the pollution liability policies would lead to absurd results. Moreover, Balfour's knowledge of maintenance work orders does not constitute the level of knowledge that Pennsylvania law

---

[2]    As discussed further below, this prior knowledge issue encompasses several related exclusions in the pollution liability insurance policies. We collectively reference these exclusions as "**Knowledge/Intent Based Exclusions**." Starr Surplus argues that Balfour's pre-policy period knowledge is established by the references to the allegedly unsafe housing conditions in the above-referenced work orders. Allianz similarly argues that Balfour's pre-policy period knowledge is established through a senior Balfour executive's testimony related to work orders.

requires the insurers to prove to avoid coverage, namely, that Balfour

knew that it faced likely legal liability that would attach its coverage.

    b.    Second, although Starr Indemnity, which issued general liability policies

to BBC, presently is paying for the defense costs associated with several

of the Underlying Claims, it seeks to allocate much of those defense costs

to Balfour's pollution liability policies under the "other insurance"

provisions in the referenced general liability policies.  But, as Balfour

explained to Starr Indemnity before filing suit, those "other insurance"

provisions do not justify the allocation that Starr Indemnity seeks.  The

general liability policies do not cover the same perils as the pollution

liability policies; an allocation is not needed to prevent a double recovery

by Balfour; and Starr Indemnity's position is contrary to Pennsylvania

law, which allows Balfour to allocate "all sums" incurred in the

Underlying Claims to any triggered coverage.  Starr Indemnity owes BBC

a full defense of the Underlying Claims, regardless of whether the

pollution liability policies might also cover the claims.

    4.    Given Starr's and Allianz's meritless coverage positions, the Insurers lack a

reasonable basis for denying the full benefits afforded under their policies.  Indeed, Starr

Surplus' and Allianz's conduct is even more egregious given that they both initially agreed to

provide coverage and/or acknowledged that coverage was possible for several of the Underlying

Claims under their pollution-liability policies, only to later flip their positions into denials of

coverage based on the same facts that were known to them when they issued their earlier

positions.  Thus, Starr Surplus and Allianz are subject to both statutory and common law bad faith claims under Pennsylvania law.

## PARTIES AND POLICIES

5.      BBI is a Delaware corporation that maintains its principal place of business at 1 Country View Road, Suite 100, Malvern, Pennsylvania 19355.  BBI is the direct parent company of BBC.

6.      BBC is a limited liability company that was formed under the laws of Delaware and maintains its principal place of business at 1 Country View Road, Suite 100, Malvern, Pennsylvania 19355.  The sole member of BBC is Plaintiff BBI.  As discussed further below, BBC owns, operates, and/or manages military housing, student housing, and conventional multi-family housing properties, including privatized family military housing projects at various military installations around the country.  BBC has set up approximately twenty special purpose entities—each of which is an affiliate of BBC—to hold ownership interests in and operate the military housing projects.

7.      Based on its public filings and/or recitations in its policy, Starr Surplus is a Texas corporation that maintains its principal place of business at 399 Park Avenue, 3rd Floor, New York, NY 10022.  Starr Surplus issued the following pollution liability policies to Balfour:

    a.      Policy No. 1000067868221 to BBC for the October 31, 2022 to October 31, 2023 policy period.[3]

    b.      Policy No. 1000067868231 to BBI for the October 31, 2023 to October 31, 2024 policy period.[4]

---

[3]   A copy of this policy is attached as **Exhibit 1**.

[4]   A copy of this policy is attached as **Exhibit 2**.

8.    Based on its public filings and/or recitations in its policy, Allianz is an Illinois corporation that maintains its principal place of business at 225 West Washington Street, Suite 1800, Chicago, IL 60606.  Allianz issued a pollution liability policy to BBI, Policy No. USL03105524, for the October 31, 2024 to October 31, 2025 policy period.[5]

9.    Based on its public filings and/or recitations in its policy, Starr Indemnity is a Texas corporation that maintains its principal place of business at 399 Park Avenue, 3rd Floor, New York, NY 10022.  Starr Indemnity issued the following general liability policies to BBC:

a.    Policy No. 1000100023201 for the October 1, 2020 to October 1, 2021 policy period.[6]

b.    Policy No. 1000100023211 for the October 1, 2021 to October 1, 2022 policy period.[7]

c.    Policy No. 1000100023221 for the October 1, 2022 to October 1, 2023 policy period.[8]

d.    Policy No. 1000100023231 for the October 1, 2023 to October 1, 2024 policy period.[9]

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, there being complete diversity of citizenship between the parties, and an amount in controversy in excess of $75,000, exclusive of interest, attorneys' fees, and costs.

---

[5]    A copy of this policy is attached as **Exhibit 3.**

[6]    A copy of this policy is attached as **Exhibit 4**.

[7]    A copy of this policy is attached as **Exhibit 5**.

[8]    A copy of this policy is attached as **Exhibit 6**.

[9]    A copy of this policy is attached as **Exhibit 7.**

11.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, based on federal-question jurisdiction.  Specifically, this Court has federal-question jurisdiction because this action seeks coverage for losses associated with various military bases that are federal enclaves, including (without limitation) Naval Air Station Key West, and thus the insurance proceeds recovered in this action will be allocated amongst those federal enclaves.

12.     This Court has personal jurisdiction over each of the Insurers because they each sold and delivered the liability insurance policies at issue in this case to BBC and BBI, each of which is headquartered in Malvern, Pennsylvania, and because Starr Surplus, Starr Indemnity, and Allianz are licensed to do business in Pennsylvania.

13.     Venue of this action likewise is properly laid in this judicial district, pursuant to 28 U.S.C. § 1391(b)(2), because the Eastern District of Pennsylvania is where BBC and BBI were each headquartered during the policy periods of the policies at issue in the case and during the disputes with the Insurers over coverage for the Underlying Claims.

## BALFOUR'S BUSINESS AND INSURANCE PROGRAM

14.     BBI, a U.S.-based investment vehicle for Balfour Beatty, plc., is an infrastructure investor that develops and finances both public and private infrastructure projects while operating a portfolio of long-term infrastructure assets.   It is the parent company of BBC.

15.     BBC is a diversified owner and manager of residential real estate, specializing in investment, asset management, and property management services in the multifamily, student, and military housing sectors.  BBC creates special purpose entities that are specific to housing projects or groups of housing projects.  The housing facilities on military bases leased, owned, and managed by BBC and the special purpose entities provide U.S. service members and their families with on-base housing across the nation.

16.    To protect its businesses from the pollution-related liability risks and/or allegations potentially associated with its residential operations, Balfour purchases towers of pollution liability insurance coverage each year.  Although these policies include the above-mentioned special purpose entities as additional insureds, the first named insured in each of those policies is either BBC or BBI.

17.    To protect its businesses from claims by its residents alleging bodily injury and/or property damage allegedly arising from its residential operations (such as those alleging water intrusions and negligent maintenance to a resident's property), Balfour purchases towers of general liability insurance coverage each year.  Although these policies include the above-mentioned special purpose entities as additional insureds, the first named insured in each of those policies is either BBC or BBI.

18.    Because either BBC or BBI is the first named insured on the relevant insurance policies, any recovery of insurance proceeds in this case will be paid to BBC or BBI (depending on which entity is the first named insured on a policy), then allocated among the impacted projects.

## THE UNDERLYING CLAIMS AND DISPUTES

### Disputes Under the Pollution Liability Policies

**I.    The Underlying Claims Involving the Pollution Liability Policies**

    **A.    Talarico**

19.    On September 4, 2024, Balfour notified Starr Surplus, under its pollution liability policies for the October 31, 2022 to October 31, 2024 policy periods, that Balfour learned that a law firm was willing to bring suit on behalf of Jackie Talarico related to allegations of, among other things, mold in residences at Naval Air Station Key West.

20.     On March 27, 2025, Jackie and Anthony Talarico and fifty-five other families (later amended to seventy-four) who lived and/or worked in Balfour housing at the Key West base filed a complaint against BBC and BBI in the Circuit Court of the Sixteenth Judicial Circuit in and for Monroe County, Florida.  They alleged property damage and bodily injury due to, among other things, water damage, "structural defects," and exposure to mold in the Balfour housing.  Although the Talarico complaint does not specify an amount of claimed damages, Balfour understands that the claimed damages are very large given that the complaint encompasses the claims of seventy-five families.

21.     On April 1, 2025, Balfour tendered the Talarico lawsuit to Starr Indemnity for coverage under its general liability policies for the October 1, 2015 through October 1, 2024 policy periods and to Starr Surplus for coverage under its pollution liability policies for the October 31, 2022 through October 31, 2024 policy periods.

22.     On April 23, 2025, Balfour tendered the Talarico lawsuit to Allianz for coverage under its pollution liability policy for the October 31, 2024 to October 31, 2025 policy period.

23.     On May 22, 2025, in response to Balfour's above referenced notice, Starr Surplus denied coverage for the Talarico lawsuit under its pollution liability policies.  Starr Surplus asserted that the claim is deemed first made prior to the inception date of Starr Surplus' first pollution liability policy and that coverage is also barred by the Knowledge/Intent Based Exclusions in the Starr Surplus pollution liability policies.

24.     On May 6, 2025, Starr Indemnity agreed under its general liability policies to participate in Balfour's defense of the Talarico lawsuit, subject to a full reservation of rights; thus, those policies are not in dispute here for the Talarico lawsuit, but they are for the Porras lawsuit, the Montiel lawsuit, and the Greer lawsuit, as discussed below.

25. On June 10, 2025, Allianz issued a letter noting that there was "potentially coverage under the Policy for loss associated with the Talarico lawsuit provided all other Policy terms and conditions are met and the Policy's Self-Insured Retention and microbial matter deductible requirements are satisfied" and asked for additional information to allow Allianz to investigate the claim.

26. But on September 29, 2025, Allianz reversed course and denied coverage for the Talarico lawsuit under its pollution liability policy, even though the facts regarding the Talarico lawsuit had not changed. Allianz asserted, among other things, that the claim is deemed first made prior to Allianz's policy period and that coverage is also barred by various Knowledge/Intent Based Exclusions because Balfour executives reportedly knew of the pollution condition claims six years prior to the filing.

27. Balfour's broker subsequently spoke to Allianz to explain why the claim is covered, but Allianz refused to withdraw its denial letter.

**B.    Dudek**

28. On September 6, 2024, John and Sarah Dudek along with four other families living in military housing at Fort Bliss and Lackland Air Force Base filed a lawsuit against BBC and BBC affiliates in the District Court for Bexar County, Texas alleging property damage and bodily injury due to, among other things, water damage, alleged structural defects, and mold in the Balfour housing. The complaint asserts that the plaintiffs "seek monetary relief over $1,000,000.00[.]"

29. On September 23, 2024, Balfour provided Starr Surplus notice of the lawsuit, seeking coverage under its pollution liability policies for the October 31, 2022 to October 31, 2024 policy periods.

30.     On March 14, 2025 and March 17, 2025, Starr Surplus issued a reservation of rights letter under its pollution liability policies, based on the same facts upon which it later would rely to deny coverage.  Specifically, Starr Surplus reserved its rights regarding, among other things, whether the work orders received by Balfour prior to the inception date qualify as claims under the policies.  Correspondingly, Starr Surplus also reserved its rights as to whether the coverage is barred by the Knowledge/Intent Based Exclusions.

31.     On September 12, 2025, Starr Surplus changed course and denied coverage for the Dudek lawsuit.  Starr Surplus based its denial on the same issues on which it had focused its earlier reservation of rights letters.  Starr Surplus asserted that the maintenance work orders qualify as claims made prior to the policy period and that these orders somehow amount to knowledge of pollution conditions.

## II.     Coverage Under Starr Surplus' Pollution Liability Policies

32.     There is coverage under the Starr Surplus pollution liability policies for losses stemming from the Talarico lawsuit and the Dudek lawsuit.

33.     Under Insuring Agreement A, the pollution liability policies issued by Starr Surplus provide coverage for "[d]amages that the insured becomes legally obligated to pay, arising out of 'claims' for 'bodily injury' and 'property damage'" due to a "pollution incident."

34.     The Starr Surplus pollution liability policies define "claim" to mean:

> [A] request or a demand received by you or the Company for money or services, including the institution of "suit" or arbitration proceedings against you seeking damages.  "Claim" and "claims" include any directive, order, or requirement of, court order issued by, or suit brought by the Government of the United States, Canada, or any local, State or Provincial Government entity of the United States of America or Canada duly acting under the authority of any law related to the protection of the environment.

35.     The Starr Surplus pollution liability policies define "pollution incident" to mean "the discharge, dispersal, seepage, migration, release or escape of any 'pollutant'" and define "pollutant" to include "microbial matter" such as "mold, fungi, and mildew, whether or not any of the foregoing is living."

36.     The Starr Surplus pollution liability policies define "bodily injury" to mean:

      a.     physical injury to, or

      b.     sickness or disease sustained by and manifesting in physical symptoms

to a natural person, including resulting:

      c.     mental or emotional anguish, mental or emotional distress or mental or emotional injury; and

      d.     death at any time.

37.     The Starr Surplus pollution liability policies define "property damage" to mean:

Physical injury to or destruction of tangible property of parties other than the insured including the resulting loss of use and diminution in value thereof.  All such loss of use and diminution in value shall be deemed to occur at the time the physical injury that caused it[.]

38.     The Talarico lawsuit and the Dudek lawsuit are each a "claim" because they all make a demand for money or services from Balfour and/or a Balfour affiliate in connection with a threatened or actual lawsuit over personal injury or property damage from mold, a pollutant.

39.     Therefore, coverage is triggered under the Starr Surplus pollution liability policies for those claims.

**III.    Starr Surplus' Attempts to Avoid Coverage**

40.     Because the Talarico lawsuit and the Dudek lawsuit trigger coverage, Starr Surplus attempts to avoid coverage by arguing that maintenance work orders were "Claims" that

occurred prior to the policy periods and, therefore, coverage is barred under the "related claim"

language of the policies, and that coverage is also barred by Knowledge/Intent Based Exclusions.

41.    Specifically, Starr Surplus' "related claim" argument is based on a clause in

Insuring Agreement A that reads:

> If additional claims are subsequently made which arise out of the same or
> related "pollution incident" as a claim already made, then all such
> additional claims, whenever made, shall be deemed first made within the
> policy year or extended reporting period in which the earliest claim arising
> out of such "pollution incident" was made, and all such claims shall be
> subject to the same Limit of Insurance.

42.    But that provision is inapplicable because a work order is clearly not a "claim" as

defined in the Starr Surplus pollution liability policies.[10]

43.    Alternatively, the policies' definition of "claim" is patently and/or latently

ambiguous and thus should be construed in favor of coverage.

44.    Moreover, even if a work order were a "claim" under the plain language of Starr

Surplus' policies, there still would be coverage under Pennsylvania's robust "reasonable

expectations of the insured" doctrine.  Specifically, and without limitation:

    a.    Upon information and belief, under custom and practice in the housing

rental industry, owners/landlords and property managers do not consider

work orders to be legal claims.  Indeed, owners and managers would not

assume that they have to report every maintenance work order to their

insurers to avoid losing coverage if a resident later sues.

    b.    Upon information and belief, under custom and practice in the insurance

industry, insurers do not typically interpret work orders as claims under

---

[10]    *See supra* ¶ 34.

their insurance policies.  Given the industry standards, Starr Surplus likely
has not considered work orders claims under policies in the past.

c.    Upon information and belief, both sets of industry custom and practice
referenced above are reflected in the course of dealing between Balfour
and Starr Surplus, including in underwriting/procurement of the Starr
Surplus pollution liability policy.  For example, and without limitation,
Starr Surplus did not alert Balfour that work orders would be considered a
claim under the policy.

d.    Starr Surplus originally accepted coverage for the Dudek lawsuit before
changing its position based on its newfound "claim" definition argument,
even though there were no intervening changes to the operative policy
language—and Starr Surplus did not point to any newly learned facts
about pre-October 31, 2022 complaints by the underlying plaintiffs in its
declination letters.

45.    Thus, Starr Surplus' "relation back" defense does not preclude coverage for the
Talarico lawsuit and the Dudek lawsuit.

46.    Starr Surplus' other argument rests on a Knowledge/Intent Based Exclusion,
which reads:

> This insurance does not apply to any "claim" . . . [c]aused by, arising out
> of or in any way related to "pollution incidences" that were known by you,
> at any time before the beginning of this policy period, to be present, or that
> were disclosed in your application for this insurance or any of the
> accompanying information provided to us[.]

47.    Starr Surplus rests its Knowledge/Intent Based Exclusion argument on the
assertion that, because Balfour knew of work orders prior to the inception of the policy period,

Balfour had knowledge of the pollution conditions at issue in the referenced Underlying Lawsuits before the policy period.

48.     But the Knowledge/Intent Based Exclusions, which are an outgrowth of the known loss doctrine, are inapplicable here because Balfour did not have the requisite knowledge. Specifically, the pre-October 31, 2022 work orders did not give Balfour knowledge that it faced likely liability that would attach its coverage.

## IV.     Coverage Under Allianz's Pollution Liability Policies

49.     There is coverage under the Allianz pollution liability policy for losses stemming from the Talarico lawsuit.

50.     Insuring Agreement C requires Allianz to "pay on behalf of the insured [for] loss that the insured becomes legally obligated to pay as a result of a claim for bodily injury or property damage resulting from a pollution condition."

51.     The Allianz policy defines claim as "a written demand seeking a remedy and alleging liability or responsibility on the part of the insured."

52.     The Allianz pollution liability policy defines "pollution condition" to mean the "discharge, dispersal, release or escape, emission, seepage . . . of any pollutant into or upon land, or any structure on land" and "the presence of microbial matter within a structure."  It also defines "microbial matter to mean "mold, mildew and fungi[.]"

53.     The Allianz pollution liability policy defines "bodily injury" to include "physical injury, sickness, disease, or [a] building-related illness sustained by any person, including death resulting therefrom, and any accompanying medical or environmental monitoring[.]"  It defines "property damage" to include "[p]hysical injury to or destruction of tangible property of parties other than the insured, including the resulting loss of use and except with respect to tangible property located on an insured's own site, diminished value of that property" and "[l]oss of use,

-14-

but not diminution of value, of tangible property of parties other than the insured, that has not

been physically injured or destroyed[.]"

54.     The Talarico lawsuit is a "claim" because the complaint seeks a remedy for bodily

injury or property damage from, among other things, mold, a pollutant.

55.     Coverage is thus triggered under the Allianz pollution liability policy for those

claims.

## V.     Allianz's Attempts to Avoid Coverage

56.     Because the Talarico lawsuit satisfies the insuring agreements of the applicable

Allianz policy, Allianz uses the work-order issue to invoke several interrelated exclusions

regarding Balfour's alleged pre-policy-period knowledge, namely, the Knowledge/Intent Based

Exclusions.  Specifically, Allianz argues that a Balfour executive's awareness of work orders

that alleged the presence of mold and the need for repairs means that coverage is barred under

the Knowledge/Intent Based Exclusions.[11]  However, those provisions are inapplicable here

---

[11]    There are three exclusions Allianz relies on under the Knowledge/Intent Based Exclusion umbrella: (1) the intentional noncompliance exclusion, (2) the prior knowledge/non-disclosure exclusion, and (3) the known claim exclusion.

The intentional noncompliance exclusion applies only to loss "arising from an intentional or illegal act or omission of any responsible insured[,]" meaning either "the manager or supervisor of the named insured responsible for environmental affairs, control or compliance (a) at the insured's own site, (b) during transportation, or (c) during covered operations" or "the risk management department, general counsel or any executive officer, director, partner, or member of the named insured."

The prior knowledge/non-disclosure exclusion in the Allianz pollution liability policy applies only to loss "arising from a pollution condition existing prior to the inception date and known by a responsible insured" (meaning "the risk management department, general counsel or any executive officer or director of the named insured") and "not disclosed in the application process, including supporting materials, for this Policy or any previous policy for which this is a renewal thereof."

The known claim exclusion in the in the Allianz pollution liability policy is limited to loss "[a]rising from a known claim or legal action existing prior to the first date of the period of insurance and known by a responsible insured[,]" meaning either "the manager or supervisor of the named insured responsible for environmental affairs, control or compliance (a) at the

because Balfour's receipt of work orders in the ordinary course of its business managing military housing fails to establish the level of knowledge by Balfour that Pennsylvania law requires Allianz to prove for the exclusions to apply; namely, that Balfour knew from the work orders that it faced likely legal liability that would attach its coverage to trigger any of the exclusions.

57.    In addition, Allianz raises the contractual liability exclusion,[12] which is clearly inapplicable under Pennsylvania law; the Talarico lawsuit includes tort claims for which BBC or a BBC affiliate would be liable regardless of whether Balfour had assumed liability in a contract.[13]

## Disputes Under the General Liability Policies

## I.    The Underlying Claims Involving the General Liability Policies

### A.    Porras

58.    On June 21, 2024, an attorney for Ruben and Ashley Porras, and their children, sent a demand letter to Balfour regarding, among other things, water leaks and mold in the family's home at Fort Gordon, Georgia.

59.    On September 27, 2024, the Porras family filed suit against BBC over those issues in the United States District Court for the Southern District of Georgia and alleged that

---

insured's own site, (b) during transportation, or (c) during covered operations" or "the risk management department, general counsel or any executive officer, director, partner, or member of the named insured."

[12]   The contractual liability is limited to loss "arising from the insured's assumption of liability in any contract, or agreement."  It "does not apply to liability that the insured would have had in the absence of the contract or agreement, or the contract or agreement is an insured contract."

[13]   The fact that the Talarico plaintiffs have a contractual relationship with BBC or a BBC affiliate is irrelevant because, under Pennsylvania law, claims for tort actions which arise during the performance of contractual obligations do not render the claims contractual in nature. Instead, Pennsylvania law recognizes that sometimes a contract is "merely [a] vehicle, or mechanism, which established the relationship between the parties" from which the tort arose. *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 70 (Pa. 2014).

they suffered property damage and bodily injury due to, among other things, unrepaired water leaks and unremedied mold in the Balfour housing.  The complaint asserts that the Porras family is "entitled to recover damages against Balfour in an amount in excess of $1,000,000.00, an exact amount to be proven at trial."

60.    On June 24, 2024, Balfour provided notice to Starr of the Porras demand letter, seeking coverage under its general liability policies for the October 1, 2020 to October 1, 2022 policy periods.

61.    On October 11, 2024, Balfour provided notice to Starr of the Porras lawsuit seeking coverage under the same general liability policies.

62.    On November 21, 2024, Starr Indemnity agreed to provide a defense to the Porras lawsuit, subject to a reservation of rights.

63.    But on April 17, 2025, Starr Indemnity sent a letter to Balfour seeking to allocate some of the defense costs being incurred in the Porras lawsuit to Starr Surplus under its pollution liability policies.  Starr Surplus had previously accepted coverage under these policies, subject to a full reservation of rights, by letter dated November 20, 2024.  This attempted allocation is prejudicial to Balfour because Starr Surplus' payments of defense costs erode the limits of its pollution liability policies, whereas Starr Indemnity's payments of defense costs do not erode the limits of its general liability policies.

64.    Starr Indemnity refused to change its position even after Balfour sent a letter on May 13, 2025, refuting Starr Indemnity's allocation arguments.

**B.    Montiel**

65.    On August 15, 2024, an attorney for Alejandro and Randal Montiel, and their children, sent a demand letter to Balfour regarding, among other things, mold in the family's home at Fort Gordon, Georgia and malfunctioning plumbing and resulting property damage.

66.     On September 20, 2024, the Montiel family filed suit over those issues in the United States District Court for the Southern District of Georgia and alleged that they suffered property damage and bodily injury due to, among other things, malfunctioning plumbing and unremedied mold in the Balfour housing.  The complaint asserts that the Montiel family is "entitled to recover monetary damages from Balfour in an amount in excess of $1,000,000.00, an exact amount to be proven at trial."

67.     On August 19, 2024, Balfour provided notice to Starr of the demand letter sent on behalf of the Montiel Family, seeking coverage under its general liability policies for the October 1, 2020 to October 1, 2023 policy periods.

68.     On September 23, 2024, Balfour provided notice to Starr of the Montiel lawsuit seeking coverage under the same general liability policies.

69.     On September 30, 2024, Starr Indemnity agreed to provide a defense to the Montiel lawsuit, subject to a reservation of rights.

70.     But on April 17, 2025, Starr Indemnity sent a letter to Balfour seeking to allocate some of the defense costs being incurred in the Montiel lawsuit to Starr Surplus under its pollution liability policies.  Starr Surplus had previously accepted coverage under those policies subject to a reservation of rights, by letter dated September 30, 2024.

71.     Starr Indemnity refused to change its position even after Balfour sent a letter on May 13, 2025, refuting Starr Indemnity's allocation arguments.

**C.    Greer**

72.     On August 27, 2024, an attorney for Jeremy Greer and Erin LaCroix-Greer sent a demand letter to Balfour regarding, among other things, a roof leak and mold in the family's home at Fort Gordon, Georgia.

73.    On November 27, 2024, the Greer family filed suit over those issues in the United States District Court for the Southern District of Georgia and alleged that they suffered property damage and bodily injury due to, among other things, defective HVAC systems, a roof leak, and unremedied mold in the Balfour housing.  The complaint asserts that the Greer family is "entitled to recover monetary damages from Balfour in an amount in excess of $1,000,000.00, an exact amount to be proven at trial."

74.    On September 5, 2024, Balfour provided notice to Starr of the demand letter sent on behalf of the Greer Family, seeking coverage under its general liability policies for the October 1, 2015 to October 1, 2023 policy periods.

75.    On November 12, 2024, Starr Indemnity issued a letter asserting that it did not have any obligations under its general liability policies because a lawsuit had not yet been filed.

76.    Balfour also provided notice to Starr Indemnity of the Greer *lawsuit*, seeking coverage under the same general liability policies.

77.    Starr Indemnity responded by agreeing to provide a defense to the Greer lawsuit, subject to a reservation of rights.

78.    But then, on April 17, 2025, Starr Indemnity sent a letter to Balfour seeking to allocate some of the defense costs being incurred in the Greer lawsuit to Starr Surplus under its pollution liability policies.  Starr Surplus had previously accepted coverage under those policies, subject to a reservation of rights, by letter dated November 12, 2024 (Starr Surplus later issued an updated reservation of rights letter on March 3, 2025).

79.    Starr Indemnity refused to change its position even after Balfour sent a letter on May 13, 2025, refuting Starr Indemnity's allocation arguments.

## II.    Coverage Under the Starr Indemnity General Liability Policies

80.    The Starr Indemnity general liability policies provide a full defense for the Porras lawsuit, the Montiel lawsuit, and the Greer lawsuit.

81.    Under Coverage A, the general liability policies issued by Starr Indemnity provide coverage for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages."

82.    These policies thus pay/cover defense costs "outside of limits."  Specifically, the general liability policies provide that Starr Indemnity's payments of defense costs do not erode the limits of the policies, which instead are eroded only by payments of judgments or settlements (if any):[14]

> Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

83.    The Starr Indemnity general liability policies define "property damage" to mean:

a.    Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.    Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

84.    The Starr Indemnity general liability policy defines "bodily injury" to mean:

a.    physical injury, sickness or disease, including death resulting from any of these;

---

[14]    When defense costs are 'outside of limits' the payment of defense costs do not decrease the amount available to pay judgements or settlements.  *See* Robert Goodman et al., *New Appleman Law of Liability Insurance* § 1.05 (Release No. 141 2025).

      b.     or the following when accompanied by physical injury, sickness or

           disease: mental anguish; shock; or emotional distress.

85.    The Starr Indemnity general liability policies define "suit" to mean:

    a civil proceeding in which damages because of "bodily injury", "property
    damage" or "personal and advertising injury" to which this insurance
    applies are alleged.  "Suit" includes:

      a.     An arbitration proceeding in which such damages are claimed and
           to which the insured must submit or does submit with our consent;
           or

      b.     Any other alternative dispute resolution proceeding in which such
           damages are claimed and to which the insured submits with our
           consent.

## III.   Starr Indemnity's Attempt to Limit Coverage

86.    In an attempt to reduce its coverage obligations under the general liability

policies, Starr Indemnity sent a letter to Balfour on April 17, 2025 seeking to allocate some of

the defense costs incurred in the Porras lawsuit, the Montiel lawsuit, and the Greer lawsuit to

Balfour's pollution liability policies.

87.    The argument was largely based on an assertion that the "other insurance"

provisions in the Starr Indemnity general liability policies renders their coverage excess of other

policies available to Balfour for purposes of the defense of those Underlying Claims, such as the

Porras lawsuit, the Montiel lawsuit, and the Greer lawsuit.

88.    But under Pennsylvania law, "other insurance" clauses do not apply unless two or

more insurance policies cover the exact same interest and subject matter and against the same

peril, and the clauses are meant only to prevent double recovery.

89.    Here, Starr Indemnity cannot credibly argue that the general liability policies and

the pollution liability policies cover the same perils.  Indeed, as Starr Indemnity itself has noted,

Balfour's general liability policies exclude some of the very risks that Balfour's pollution-

liability policies cover.  And Starr Indemnity has not even attempted to show that failing to adopt its proposed allocation would result in Balfour recovering more than 100% of its expenditures in the Underlying Claims from its insurers.

90.    Further, Starr Indemnity's position is contrary to settled Pennsylvania law regarding allocation among multiple implicated policies.  Specifically, under Pennsylvania's "all sums" allocation approach, Balfour may allocate all of its expenditures in the Underlying Claims, including the Porras lawsuit, the Montiel lawsuit, and the Greer lawsuit, to any triggered coverage, here, the Starr Indemnity general-liability coverage.

91.    Nor should Starr Indemnity be attempting to allocate defense costs to other policies in a way that prejudices Balfour.  General liability policies cover defense costs outside of limits whereas pollution liability policies do not.  With Starr Indemnity's proposed allocation, the pollution liability policy's limits could be largely eroded purely from defense costs.

<u>**CAUSES OF ACTION**</u>

**<u>COUNT I</u>:  DECLARATORY JUDGEMENT REGARDING COVERAGE FOR THE TALARICO LAWSUIT AND THE DUDEK LAWSUIT AGAINST STARR SURPLUS**

92.    Plaintiff repleads and incorporates by reference, as if fully set forth herein, the facts and allegations set forth in all paragraphs above.

93.    Pursuant to 28 U.S.C. § 2201(a) and Federal Rule of Civil Procedure 57, an actual controversy of a justiciable nature exists between Balfour and Starr Surplus regarding the parties' rights and obligations under the Starr Surplus pollution liability policies, and specifically regarding the interpretation of the Starr Surplus pollution liability policies, including, without limitation, the interpretation of: (1) the definition of "claim" and (2) the various Knowledge/Intent Based Exclusions in these policies.

94.     The issuance of declaratory relief by this Court will terminate some or all of the existing controversies between the parties.

95.     Balfour seeks a declaratory judgment, as against Starr Surplus, that the Talarico lawsuit and the Dudek lawsuit are covered under the noticed Starr Surplus pollution liability policies; and that Starr Surplus' defenses based on work orders do not bar coverage for future similar claims under any subsequent pollution liability policies issued by Starr Surplus to Balfour.

96.     All premiums due and owing under the terms of the Starr Surplus pollution liability policies have been paid, and all conditions precedent under those policies also have been satisfied and/or waived by Starr Surplus.

97.     Each of the noticed Starr Surplus pollution liability policies obligate Starr Surplus to cover losses stemming from the Talarico lawsuit and the Dudek lawsuit for the reasons explained above.

98.     Starr Surplus denied coverage for the Talarico lawsuit and the Dudek lawsuit under its pollution liability policies for the reasons explained in Starr Surplus' denial letters, as described above.

99.     For the reasons explained above, the Talarico lawsuit and the Dudek lawsuit are covered under the Starr Surplus pollution liability policies; and Starr Surplus' defenses based on work orders similarly do not bar coverage for future similar claims filed within the policy periods of any subsequent pollution liability policies issued by Starr Surplus to Balfour.

100.     An actual controversy exists between Balfour and Starr Surplus regarding their rights and obligations under the Starr Surplus pollution liability policies, and, by extension, under any subsequent pollution liability policies issued by Starr Surplus to Balfour.

101.    The above-described controversies are between parties whose interests are real and adverse, and the issues are ripe for judicial determination.

102.    Pursuant to 28 U.S.C. § 2201, Balfour is entitled to a declaratory judgment, as to Starr Surplus, that the Talarico lawsuit and the Dudek lawsuit are covered under the noticed Starr Surplus pollution liability policies; and that Starr Surplus' defenses based on work orders do not bar coverage for future similar claims filed within the policy periods of any subsequent pollution liability policies issued by Starr Surplus to Balfour.

## COUNT II:  DECLARATORY JUDGEMENT REGARDING COVERAGE FOR THE TALARICO LAWSUIT AGAINST ALLIANZ

103.    Plaintiff repleads and incorporates by reference, as if fully set forth herein, the facts and allegations set forth in all paragraphs above.

104.    Pursuant to 28 U.S.C. § 2201(a) and Federal Rule of Civil Procedure 57, an actual controversy of a justiciable nature exists between Balfour and Allianz regarding the parties' rights and obligations under the Allianz pollution liability policy, and specifically regarding the interpretation of the Allianz pollution liability policy, including, without limitation, the interpretation of:  (1) the definition of "claim" and (2) the various Knowledge/Intent Based Exclusions in these policies.

105.    The issuance of declaratory relief by this Court will terminate some or all of the existing controversies between the parties.

106.    Balfour seeks a declaratory judgement, as against Allianz, that the Talarico lawsuit is covered under the Allianz pollution liability policy; and that Allianz's defenses based on work orders do not bar coverage for future similar claims under subsequent pollution liability policies issued by Allianz to Balfour.

107.    All premiums due and owing under the terms of the Allianz pollution liability policy have been paid, and all conditions precedent under that policy also have been satisfied and/or waived by Allianz.

108.    The Allianz pollution liability policy obligates Allianz to cover losses stemming from the Talarico lawsuit, for the reasons explained above.

109.    Allianz denied coverage for the Talarico lawsuit under its pollution liability policy for the reasons explained in its denial letter, as described above.

110.    For the reasons explained above, the Talarico lawsuit is covered under the Allianz pollution liability policy; and Allianz's defenses based on work orders similarly do not bar coverage for future similar claims filed within the policy periods of subsequent pollution liability policies issued by Allianz to Balfour.

111.    An actual controversy exists between Balfour and Allianz regarding their rights and obligations under the Allianz pollution liability policy, and, by extension, subsequent pollution liability policies issued by Allianz to Balfour.

112.    The above-described controversies are between parties whose interests are real and adverse, and the issues are ripe for judicial determination.

113.    Pursuant to 28 U.S.C. § 2201, Balfour is entitled to a declaratory judgment, as to Allianz, that the Talarico lawsuit is covered under the Allianz pollution liability policy; and that Allianz's defenses based on work orders do not bar coverage for future similar claims filed within the policy periods of subsequent pollution liability policies issued by Allianz to Balfour.

### COUNT III:  DECLARATORY JUDGEMENT REGARDING ALLOCATION OF DEFENSE COSTS AGAINST STARR INDEMNITY

114.    Plaintiff repleads and incorporates by reference, as if fully set forth herein, the facts and allegations set forth in all paragraphs above.

115.    Pursuant to 28 U.S.C. § 2201(a) and Federal Rule of Civil Procedure 57, an actual controversy of a justiciable nature exists between Balfour and Starr Indemnity regarding the parties' rights and obligations under the Starr Indemnity general liability policies, including, without limitation, regarding Starr Indemnity's claimed right to allocate costs otherwise covered by these policies to pollution liability policies.

116.    The issuance of declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

117.    Starr Indemnity seeks to allocate some of the defense costs incurred in connection with the Porras lawsuit, the Montiel lawsuit, and the Greer lawsuit to Balfour's pollution liability policies and it likely will seek to do so for future similar claims.

118.    All premiums due and owing under the terms of the Starr Indemnity general liability policies have been paid, and all conditions precedent under those policies also have been satisfied and/or waived by Starr Indemnity.

119.    The Starr Indemnity general liability policies obligate Starr Indemnity to provide a full defense for the Porras lawsuit, the Montiel lawsuit, the Greer lawsuit, and future similar claims because the complaints in those actions include allegations of property damage and/or bodily injury during the policy period, caused by a water incursion or another covered peril.

120.    Starr Indemnity asserts that it can allocate defense costs to Balfour's pollution liability policies under the "other insurance" provisions in the Starr Indemnity general liability policies.

121.    For the reasons explained above, the "other insurance" provisions do not apply, so Starr Indemnity cannot allocate defense costs to Balfour's pollution liability policies.

122.    An actual controversy exists between Balfour and Starr Indemnity regarding their rights and obligations under the Starr Indemnity general liability policies.

123.    The above-described controversies are between parties whose interests are real and adverse, and the issues are ripe for judicial determination.

124.    Pursuant to 28 U.S.C. § 2201, Balfour is entitled to a declaratory judgment, as to Starr Indemnity, that the Porras lawsuit, the Montiel lawsuit, the Greer lawsuit, and future similar claims are fully covered under the Starr Indemnity general liability policies.

**COUNT IV:  CLAIM AGAINST STARR SURPLUS AND ALLIANZ FOR BREACH OF THE COMMON LAW DUTY TO ACT IN GOOD FAITH UNDER THEIR INSURANCE CONTRACTS**

125.    Plaintiff repleads and incorporates by reference, as if fully set forth herein, the facts and allegations set forth in all paragraphs above.

126.    Balfour's claims are clearly covered under the Insurers' pollution liability policies for the reasons explained above.

127.    Starr Surplus and Allianz have acted in violation of the contractual duty to act in good faith by, among other things:

      a.    arguing that a maintenance work order is a "claim" as defined in the pollution liability policies and that such work orders thus also trigger the Knowledge/Intent Based Exclusions, despite clear and contrary policy language, clear and contrary industry custom and practice, and clear and contrary course of dealing between the parties;

      b.    Reversing and/or otherwise changing their coverage positions in connection with the Talarico lawsuit, and, as to Starr Surplus, the Dudek lawsuit, from reservations of rights to denials of coverage, despite the absence of any new relevant information or development in the law.

128.    The above-listed conduct reveals that Starr Surplus and Allianz have at least negligently denied coverage.

129.    As a direct and proximate result of these two Insurers' bad faith denial of coverage, Balfour has sustained, and will continue to sustain, significant monetary damages including, without limitation, attorneys' fees and expenses incurred in seeking to enforce the Insurers' contractual obligations.

## COUNT V:  CLAIM AGAINST STARR SURPLUS AND ALLIANZ PURSUANT TO 42 P.S. § 8371

130.    Plaintiff repleads and incorporates by reference, as if fully set forth herein, the facts and allegations set forth in all paragraphs above.

131.    Balfour's claims are plainly covered by the pollution liability policies for the reasons explained above.

132.    Starr Surplus and Allianz have acted in bad faith by, among other things:

a.    arguing that a maintenance work order is a "claim" as defined in the pollution liability policies and that such work orders thus also trigger the Knowledge/Intent Based Exclusions, despite clear and contrary policy language, clear and contrary industry custom and practice, and clear and contrary course of dealing between the parties;

b.    Reversing and/or otherwise changing their coverage positions in connection with the Talarico lawsuit and, as to Starr Surplus, the Dudek lawsuit, from reservations of rights to denials of coverage, despite the absence of any new relevant information or development in the law.

133.    Indeed, a reversal of position without any relevant development of fact or law exemplifies the degree to which the Insurers lack a basis for their position.  An insurer looking at

the same set of circumstances and case law and coming to two different conclusions within a few months' time can only be explained by a reckless disregard of a lack of reasonable basis for denial.

134.     As a direct and proximate result of these two Insurers' bad faith denial of coverage, Balfour has sustained and will continue to sustain significant monetary damages, including without limitation attorneys' fees and expenses incurred in seeking to enforce the Insurers' contractual obligations.

135.     As a result of these two Insurer's bad faith denial of coverage, Balfour is entitled to "interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%" and court costs and attorneys' fees under 42 PA.C.S. § 8371.

## PRAYER FOR RELIEF

WHEREFORE, Balfour respectfully move this Court to enter judgment as follows:

(a)     Enter judgment in favor of each Plaintiff and against each Defendant on all the counts in the Complaint;

(b)     A declaration that the Talarico lawsuit and the Dudek lawsuit, and future similar claims regarding policy interpretation are covered under the Starr Surplus pollution liability policies;

(c)     A declaration that the Talarico lawsuit and future similar claims are covered under the Allianz pollution liability policy;

(d)     A declaration that the Porras lawsuit and future similar claims are fully covered under the Starr Indemnity general liability policy;

(e)     A judgment that Starr Surplus and Allianz acted in bad faith in denying coverage for the Talarico lawsuit, and that Starr Surplus similarly acted in bad faith in denying coverage for the Dudek lawsuit, including an award of monetary damages to Balfour for attorney costs and fees, compensatory damages, and punitive damages in any amount necessary to compensate Balfour for the losses incurred in enforcing Starr Surplus' and Allianz's contractual obligations (including pre- and post-judgment interest);

-29-

(f)      Such other relief as the court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable herein.


Respectfully submitted,

Date:  January 16, 2026                   MONTGOMERY McCRACKEN
                                                        WALKER & RHOADS, LLP

/s/        RGPlacey
Richard G. Placey (ID No. 37713)
1735 Market Street, 20th  Floor
Philadelphia, PA 19103
Tel: (215) 772-1500
Fax: (215) 731-3904
rplacey@mmwr.com

Barry I. Buchman (*pro hac vice* motion forthcoming)
Adrian C. Azer (*pro hac vice* motion forthcoming)
HAYNES AND BOONE, LLP
800 17th Street, NW, Suite 500
Washington, DC 20006
Tel: (202) 654-4500
Barry.Buchman@haynesboone.com
Adrian.Azer@haynesboone.com

*Attorneys for Plaintiffs*